UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF ILLINOIS; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI‘I; STATE OF MAINE; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; and STATE OF WISCONSIN,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, in his official capacity as the Secretary of the Department of Health and Human Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; and DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services,

Defendants.

CIVIL ACTION No.
26-cv-14051

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, the State of Illinois; State of California; State of Connecticut; State of Maryland; Commonwealth of Massachusetts; State of Colorado; State of Delaware; District of Columbia; State of Hawaiʻi; State of Maine; State of Michigan; State of Minnesota; State of Nevada; State of New Jersey; State of New York; State of Oregon; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; State of Rhode Island; State of Vermont; Commonwealth of Virginia; State of Washington; and State of Wisconsin allege as follows:

**INTRODUCTION**

1. Since the first day of President Trump's second term, his Administration has moved quickly and aggressively to enlarge the powers of the Executive Branch, without Congressional authority, across all corners of the federal government. The Administration seeks such broad and unprecedented powers in part to advance its social policy agenda, a key component of which involves relentless attacks on a small and vulnerable population—transgender individuals—whose very existence the President scapegoats to stoke national division.

2. The Administration's efforts play out here in a rule that would undermine the purpose and upend the longstanding structure of Medicaid, the cooperative state-federal program that is premised on the federal government supplying states with significant funding to support healthcare for low-income individuals subject to specific statutory restrictions. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015); *Judulang v. Holder*, 565 U.S. 42, 64 (2011) (striking down agency rule as "unmoored from the purposes and concerns of the [underlying] laws"). Similarly, the Children's Health Insurance Program ("CHIP") is a state-federal program that provides health insurance coverage for low-income youth with income above Medicaid eligibility but no health insurance.

3. The Social Security Act ("SSA") has long granted states the authority to administer Medicaid and CHIP consistent with local values and priorities, and the discretion to design their Medicaid and CHIP programs to provide services beyond those statutorily required under the SSA.

4. Yet the U.S. Department of Health and Human Services ("HHS") and Centers for Medicare & Medicaid Services ("CMS"), without precedent or Congressional authorization, have now promulgated a rule that eliminates the states' longstanding authority under Medicaid and CHIP to obtain federal reimbursement for certain categories of transgender healthcare for adolescents, also known as "gender-affirming care."[1]

5. Specifically, on August 13, 2026, CMS published a final rule, titled "Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children." 91 Fed. Reg. 52406 (to be codified at 42 C.F.R. § 441.800, § 441.801, § 441.802, and § 457.476) (the "Rule"). The Rule prohibits states from using federal dollars to fund specific forms of transgender healthcare for individuals under 18 in their Medicaid programs, and for individuals under 19 in their CHIP programs. Healthcare for which federal reimbursement is prohibited under the Rule includes puberty suppressing medications, hormone therapy, and surgical procedures, when (and only when) used to treat gender dysphoria ("targeted healthcare").[2]

6. In adopting this Rule, CMS acts without statutory authority or a reasoned basis to categorically exclude certain healthcare services from federal reimbursement. Congress has vested the states with the authority to determine which services would be covered under their Medicaid and CHIP programs when made pursuant to individualized determinations of medical necessity.

---

[1] In this Complaint, "transgender healthcare for adolescents" refers to medical treatment for gender dysphoria, also commonly referred to as "gender-affirming care," for patients under the age of 18 or 19.

[2] Many of the same medications used to treat gender dysphoria are used to treat other medical diagnoses such as central precocious puberty, uterine fibroids, male hypogonadism, and delayed puberty in males, among other diagnoses. The Rule denies funding for these medications only if used to treat gender dysphoria.

Plaintiff States have thus sought and received federal reimbursement for healthcare treatments for transgender adolescents without issue for many years. Contrary to Congress's clear directive, the Rule strips the states of their statutorily authorized role as Medicaid and CHIP administrators, usurps the states' medical necessity determinations, and permits the federal government to unilaterally prohibit federal financial participation ("FFP") or reimbursement for certain types of healthcare treatments and services, only when those treatments and services are provided to transgender adolescents. Congress has never empowered Defendants to do so.

7. Even CMS admits several times throughout the Rule that this is unprecedented action, acknowledging the agency has "not previously relied on [the statutory provisions it relies on in the Rule] to establish a purpose-based restriction on FFP for a specific category of services in this manner," nor "historically taken a position at the Federal level that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary." 91 Fed. Reg. 52443–44.

8. There is good reason that such actions have never been undertaken: the statutory scheme does not authorize it. CMS does not, as it suggests, have broad authority under the statutory provisions it cites, nor do these provisions override the many other statutory provisions that independently render the Rule unlawful. *See, e.g.*, 91 Fed. Reg. 52450 (Section 1927 of the SSA) and 52462 (Section 2110(a)(24) of the SSA).

9. Through this Rule, CMS sets a troubling and unlawful precedent that the Executive Branch can, without Congressional authorization, replace individualized medical judgments made by licensed practitioners consistent with state law with a categorical, agency-determined prohibition on federal reimbursement for healthcare it happens to disfavor, even where the care is widely supported by medical professionals and protected by law in many Plaintiff States.

10. The Rule violates the Administrative Procedure Act ("APA") several times over.

11. *First,* the Rule exceeds CMS's statutory authority. No statute authorizes Defendants to categorically prohibit the use of federal funds for medically necessary healthcare services that a state includes in its Medicaid and CHIP programs and that CMS has already approved as part of a state's State Plan.

12. *Second,* the Rule is contrary to several federal laws and regulations that grant states the authority and discretion to use federal funding to cover the targeted healthcare, including the Affordable Care Act ("ACA") and provisions of the statutes and regulations governing Medicaid and CHIP. Indeed, the Rule departs from CMS's own longstanding practice of providing federal reimbursement for the targeted healthcare to participants in state Medicaid and CHIP programs.

13. *Third,* the Rule is arbitrary and capricious because CMS has not engaged in reasoned decision-making as evidenced by the Rule's principal reliance on Defendants' own report "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices" (the "HHS Report" or "Report")—which was the product of a process that violated the Federal Advisory Committee Act and which the nation's major medical associations have described as methodologically unsound—while failing to adequately consider the broad medical consensus as to the safety and efficacy of transgender healthcare for adolescents and strong state law guardrails to ensure such high-quality care. CMS also failed to provide adequate justification to prohibit federal reimbursement for the previously covered targeted healthcare and instead relied on pretextual explanations to conceal its animus towards transgender adolescents. Actions taken by this Administration further evidence that the Rule is an outgrowth of the Administration's categorical predetermination that the targeted healthcare should be eliminated. Finally, CMS failed to adequately address Plaintiff States' and other stakeholders' reliance interests and the immense harms and costs the Rule will impose.

14. The Rule further violates the Spending Clause because CMS has significantly altered the fundamental conditions attached to Medicaid funding without notice or authority from Congress, which did not unambiguously empower CMS to usurp the states' medical necessity determinations or unilaterally exclude previously covered services for a particular class of beneficiaries from federal reimbursement. In doing so here, CMS has so significantly altered the fundamental conditions attached to Medicaid dollars that the Rule "accomplishes a shift in kind, not merely degree" in violation of the Spending Clause. *New York v. United States HHS*, 414 F. Supp. 3d 475, 567 (S.D.N.Y. 2019) (quoting *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012) ("*NFIB*")) (alterations omitted).

15. The Rule has immediate, significant, and harmful effects on Plaintiff States, including fiscal harms resulting from the loss of federal funding for necessary healthcare many Plaintiff States are required to cover and will continue to fund from their own already strained budgets, as well as significant operational costs state Medicaid agencies will incur to comply with the Rule. And if Plaintiffs cannot assume the full cost of this healthcare, the Rule will further burden them by denying coverage to adolescents who, as a result, will require more costly healthcare immediately and later in life—costs that will ultimately be borne by those states, which the Rule acknowledges but refuses to take into account. The Rule also infringes on Plaintiff States' authority to administer their approved Medicaid and CHIP programs in accordance with state law and established standards of care within their states.

16. Defendants have no legal basis to withhold federal reimbursement under Medicaid or CHIP for the targeted healthcare. This Court should declare the Rule unlawful and unconstitutional, vacate and set aside the Rule, and enjoin Defendants from enforcing it in the Plaintiff States.

## JURISDICTION

17. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 1346, 1361, and the Administrative Procedure Act, 5 U.S.C. § 702.

18. Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

19. Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(b)(2) and (e)(1), and 5 U.S.C. § 703. Defendants are United States agencies or officers sued in their official capacities. Plaintiff Commonwealth of Massachusetts is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this district.

## PARTIES

20. Plaintiff, the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is authorized to pursue this action under Illinois law. *See* 15 Ill. Comp. Stat. 205/4.

21. Plaintiff, the State of California, is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, who is the chief legal officer of California.

22. Plaintiff, the State of Connecticut, represented by and through the Attorney General, William M. Tong, is a sovereign state of the United States of America. Attorney General Tong is the State's chief legal officer. *See* Conn. Gen. Stat. § 3-125.

23. Plaintiff, the State of Maryland, is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

24. Plaintiff, the Commonwealth of Massachusetts, is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

25. Plaintiff, the State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state in the United States of America. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

26. Plaintiff, the State of Delaware, is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

27. Plaintiff, the District of Columbia, is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb, who has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

28. Plaintiff, the State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Haw. Rev. Stat. § 28-1 to pursue this action.

29. Plaintiff, the State of Maine, is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

30. Plaintiff, the State of Michigan, is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

31. Plaintiff, the State of Minnesota, is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

32. Plaintiff, the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

33. Plaintiff, the State of New Jersey, is a sovereign state in the United States of America. New Jersey is represented by Jennifer Davenport, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

34. Plaintiff, the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Exec. Law § 63 to pursue this action.

35. Plaintiff, the State of Oregon, is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

36. Plaintiff, Josh Shapiro, brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive

power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

37. Plaintiff, the State of Rhode Island, is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

38. Plaintiff, the State of Vermont, is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

39. Plaintiff, the Commonwealth of Virginia, is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

40. Plaintiff, the State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030(1) to pursue this action.

41. Plaintiff, the State of Wisconsin, is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25 (1m) to pursue this action on behalf of the State of Wisconsin.

42. Defendant HHS is a cabinet department of the federal government. HHS is an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

43. Defendant Robert F. Kennedy, Jr. is the Secretary of the Department of Health and Human Services. He is sued in his official capacity.

44. Defendant CMS is an agency within HHS that is responsible for administering the Medicaid and Medicare Acts.

45. Defendant Dr. Mehmet Oz is Administrator of CMS and is charged with administering the Medicaid and CHIP programs. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. As Healthcare Regulators, the States Maintain and Enforce Standards of Care to Protect the Health of Their Residents.

46. It is well-settled that states, via their traditional police powers, have the authority and discretion to enact laws and policies aimed at protecting the health and welfare of their residents[3]—a principle most recently recognized by the Supreme Court in *United States v. Skrmetti*.[4] As CMS itself recognizes, Plaintiffs exercise this longstanding authority through the oversight of healthcare. *See*, *e.g.*, 91 Fed. Reg. 52477 ("We agree with commenters that the States have traditionally used their policy powers to regulate the practice of medicine."). Plaintiffs license or otherwise establish qualifications for physicians and other medical professionals operating in their states.[5] Once licensed, medical professionals are subject to significant regulation and

[3] *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 364 (2025) ("States have traditionally exercised primary responsibility over matters of health and safety, including the regulation of the practice of medicine.") (internal quotation marks omitted); *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) ("[W]e begin by noting that the historic police powers of the State include the regulation of matters of health and safety."); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977); *Linder v. United States*, 268 U.S. 5, 18 (1925) ("It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions."); *Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002).

[4] 605 U.S. 495, 525 (2025) (recognizing the states' wide discretion to regulate medical care, including state laws regulating the provision of transgender healthcare for adolescents, and emphasizing the need for "legislative flexibility in this area" as it is the subject of "fierce medical and policy debates about [] safety, efficacy, and propriety").

[5] *See generally, e.g.*, Cal. Bus. & Prof. Code § 2052 (prohibiting the practice of medicine without a license); Cal. Bus. & Prof. Code §§ 2080–2099 (listing requirements to be licensed as a physician); Colo. Rev. Stat §§ 12-240-105; 107; 110 (creating the Colorado Medical Board, defining the scope of the practice of medicine, and establishing the qualifications for licensure to practice medicine); Conn. Gen. Stat. § 20-13c (listing grounds for license revocation); Haw. Rev. Stat. § 453-2 (requiring licensure to practice medicine); 225 Ill. Comp. Stat. § 60/3 (prohibiting the practice

oversight by Plaintiffs, including through, *inter alia*, continuing education requirements, and investigatory and disciplinary regulation.[6]

47. As part of this state law regulatory framework, Plaintiff States enforce laws intended to ensure patients are appropriately informed of treatment risks and give their voluntary informed consent for all medical care. This is equally true for adolescents whose parents or legal guardians have responsibility for providing informed consent, with limited exceptions.[7]

---

of medicine without a license); Mass. Gen. Laws ch. 13, §§ 9–11; Mass. Gen. Laws ch. 112, §§ 2–12D, 61; 243 Mass. Code Regs. 2.00 *et seq.* (governing licensure of physicians); Mich. Comp. Laws § 333.17011 (requiring licensure to practice medicine); N.J. Stat. Ann. § 45:9-6 (requiring licensure to practice medicine or surgery); N.Y. Educ. Law § 6524 (listing requirements for licensure); N.Y. Pub. Health Law § 230 (establishing the State board for Professional Medical Conduct which handles disciplinary actions, investigations, and physician monitoring); 63 P.S. §§ 422.1–422.51a, §§ 271.1–271.19 (governing licensure of physicians and allied health professionals); 49 Pa. Code § 16.61 (providing for suspension or revocation of physicians' licenses for incompetence or unprofessional conduct); R.I. Gen. Laws §§ 5-37-2(a)(1), 5-34-2, 5-54-9 (governing licensure of physicians); Vt. Stat. Ann. tit. 26, § 1391 (requiring licensure to practice medicine); Wash. Rev. Code §§ 18.71.002–810 (governing licensure of physicians); Wis. Stat. § 15.08; Wis. Stat. ch. 448; Wis. Admin. Code ch. MED 1–27 (same).

[6] *See, e.g.*, Cal. Bus. & Prof. Code §§ 2190 (requiring licensed physicians and surgeons to satisfy continuing education requirements every four to six years), 2220 (requiring the Medical Board of California to investigate complaints against licensed physicians and surgeons), 2234 (defining "unprofessional conduct" and requiring action against physicians and surgeons who engage in unprofessional conduct); Colo. Rev. Stat. §§ 12-240-121; 125; 130.5 (defining "unprofessional conduct," establishing the medical licensure disciplinary process, and outlining continuing medical education requirements); Haw. Rev. Stat. § 453-8 (granting the medical board authority to revoke, limit, or suspend licenses to practice medicine and surgery for any cause authorized by law); Mass. Gen. Laws ch. 112, § 61 (granting board power to revoke licenses); Mich. Comp. Laws §§ 333.16201(2), 333.16221 (granting board power to revoke licenses); N.J. Stat. Ann. § 45:1-18 (granting all professional boards investigatory powers); N.J. Stat. Ann. § 45:1-21 (prohibiting all licensees, including healthcare professionals, from engaging in professional misconduct, gross negligence, and dishonesty and misrepresentation); N.Y. Educ. Law § 6530 (defining "professional misconduct" for physicians and other medical providers); N.Y. Pub. Health Law § 230-B (providing disciplinary powers over physician's assistants); R.I. Gen. Laws §§ 5-37-1.3, 5-37-5.1 (providing disciplinary powers over physicians); Vt. Stat. Ann. tit. 26, §§ 1354 (defining unprofessional conduct), 1400 (requiring continuing medical education); Wash. Rev. Code §§ 18.130 (uniform disciplinary act applicable to health professions); Wis. Stat. §§ 448.02, 448.978 (establishing disciplinary board for physicians).

[7] Cal. Code Regs. tit. 9, § 784.29 (requiring informed consent to medical treatments); Cal. Fam. Code §§ 6922–6930 (describing the limited, specific circumstances in which a parent or guardian's informed consent is not required); Colo. Rev. Stat. §§ 13-22-102 to 106 (outlining consent requirements for certain medical, dental, and related care services for minors); 410 Ill. Comp. Stat. 210/2 ("Any parent . . . may consent to the performance upon his or her child of a health care service by a physician licensed to practice medicine in all its branches, a chiropractic physician, a licensed optometrist, a licensed advanced practice registered nurse, or a licensed physician assistant or a dental procedure by a licensed dentist."); 115 Mass. Code Regs. 5.08 (requiring informed consent); N.Y. Pub. Health Law § 2504 (enabling certain persons to consent for certain medical, dental, and hospital services); N.J. Stat. Ann. §§ 26:2H-12.8 (requiring informed consent to medical treatments), 9:17A-4 (describing limited circumstances in which parent or guardian's informed consent is not required); N.Y. Mental Hygiene Law § 33.21 (requiring parental consent for treatment of minors in some circumstances); R.I. Gen. Laws § 23-4.6-1 (outlining consent requirements); Wash. Rev. Code § 7.70.065 (outlining consent requirements).

48. State authority to regulate health and welfare also encompasses maintaining and enforcing evidence-based, rigorous standards of care to ensure the provision of high-quality healthcare, which includes everything from laws related to the safety, treatment, and insurance coverage of pediatric medical care to guidelines related to the safe consumption of vitamins.[8]

49. Many Plaintiff States have enacted laws and regulations to protect and provide coverage for the targeted healthcare.[9] In doing so, these States have concluded that, when medically necessary, such treatment is consistent with the standard of care for transgender healthcare for adolescents specifically within their states.

**B. States as Medicaid Administrators Have Broad Discretion Over the Operation of Their Medicaid and CHIP Programs.**

50. Consistent with the states' traditional power to regulate the health, welfare, and safety of their residents, the Medicaid and CHIP statutory schemes grant states significant authority to implement the program's goals and design state programs, with limited oversight from the federal government.

[8] *See, e.g.*, Cal. Code Regs. tit. 22, § 51215.8 (describing the requirements for pediatric subacute care units); Cal. Health and Safety Code § 124040 (describing the standards for community child health programs); Cal. Ins. Code § 10123.5 (requiring insurers to provide benefits for the comprehensive preventive care of children); 305 Ill. Comp. Stat. 5/5-19 (requiring health screening examinations to "include anticipatory guidance as recommended by the American Academy of Pediatrics [(AAP)]"); 215 Ill. Comp. Stat. 5/356s (setting post-parturition care hospital coverage based on AAP guidelines and protocols); *Resources for Managing Vitamin D Therapy*, Ill. Dep't of Healthcare & Family Servs. (last visited Mar. 11, 2026), https://web.archive.org/web/20260901172035/https://hfs.illinois.gov/medicalproviders/pharmacy/vitamindtherapy.html (using Endocrine Society guidelines "to help providers meet patient care needs" for Vitamin D consumption); Mass. Gen. Laws ch. 112; Mass. Gen. Laws ch 118E, § 84; Mich. Comp. Laws §§ 289.7112 (adopting 21 C.F.R. Part 111's regulation of dietary supplements), 500.3406bb (setting minimum required health insurance coverage including pediatric services and "evidence-informed preventive care and screenings" for "infants, children, and adolescents"); N.Y. Comp. Codes R. & Regs. tit. 11, §§ 522.72, 52.75 (prohibiting discrimination on the basis of gender identity and expression in health insurance); R.I. Gen. Laws §§ 23-1-1, 23-1-18 (empowering health department to set standards).

[9] *See*, *e.g.*, Colo. Rev. Stat. §§ 10-16-121(1)(f), 10-16-104(30), 12-30-121, 13-21-133, 16-3-102(2), 16-3-301(4) (setting out coverage requirements for gender-affirming care services); 2026 Haw. Sess. Laws Act 059 (legally protecting gender-affirming care); N.J. Stat. Ann. § 30:4D-9.1.b.(4)(a) (prohibiting denying or limiting coverage, or denying a claim, for health care services, including hormone therapy, due to a covered person's gender identity or expression or for the reason that the covered person is a transgender person); N.Y. Comp. Codes R. & Regs. tit. 11, § 505.2(l) (covering treatment for gender dysphoria); Or. Rev. Stat. §§ 24.500(2) (declaring prohibitions on gender-affirming care contrary to state policy), 675.070, 675.540, 675.745, 676.313, 677.190 (implementing said policy); Vt. Stat. Ann. tit. 1, § 150(a)–(b) (legally protecting gender-affirming care); Wash. Rev. Code § 74.09.675 (prohibiting discrimination in provision of gender-affirming care services).

51. Authorized by Title XIX of the SSA (42 U.S.C. § 1396), Congress enacted Medicaid into law in 1965 ("the Medicaid Act"). The Medicaid health insurance program is a state-federal partnership established to pay for healthcare for low-income and other eligible individuals. Each state administers its own Medicaid program, with state-determined income eligibility standards, benefits, provider payment policies, and other requirements, some of which are shaped by federal guidelines. State Medicaid agencies provide health insurance for individuals, including children, using both state and federal money; the share of federal funding varies by state.

52. CHIP is a related state-federal cooperative healthcare program authorized by Title XXI of the SSA (42 U.S.C. § 1397aa et seq.) that provides coverage for certain low-income children and pregnant women. States may design their CHIP program as a program separate from their state Medicaid plan, as an expansion of their Medicaid plan, or both. As with Medicaid, states retain significant discretion to determine which services and care are included and which providers may participate in their CHIP programs.

53. An estimated 37% of young people under 19 in the United States are covered by Medicaid or CHIP and by Medicaid's Early and Periodic Screening, Diagnostic, and Treatment obligations applicable to those under 21.[10]

54. Since their inception, Medicaid and CHIP have operated as state-federal partnerships with states administering the programs and the federal government covering a substantial portion of the costs, reimbursing states between 50% and 90% of expenditures for eligible children and adults. State participation in Medicaid is voluntary, but if a state chooses to participate (and every state has; *see NFIB*, 567 U.S. at 542), then it must comply with federal

[10] *October 2025 Medicaid & CHIP Enrollment Data Highlights*, Centers for Medicare & Medicaid Services (Jan. 29, 2026), https://perma.cc/NH3N-LA8Y.

statutory and regulatory requirements. If a state administers its Medicaid plan consistent with the federal rules, it is eligible to receive FFP with no cap. The same is true for CHIP.[11]

55. Plaintiffs entered into the Medicaid and CHIP partnership with the understanding that the Medicaid Act affords "substantial discretion" to participating states to administer their programs. *Alexander v. Choate,* 469 U.S. 287, 303 (1985). That commitment to state discretion is codified in the text and structure of the Medicaid Act itself. For example, under Medicaid, states are statutorily required to cover certain broad categories of medical care and may cover additional services if they wish with a federal match. *See* 42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 440.225. Because of the states' wide latitude in implementing and administering Medicaid and CHIP, every Medicaid program is different and reflects each state's unique needs.

56. Specifically, states utilize an array of delivery systems that dictate how the state structures its Medicaid and CHIP programs and how payments are made under those programs. Some states employ a fee-for-service model wherein healthcare providers are paid by the state Medicaid program for each medically necessary service they provide to enrollees. The state Medicaid program then seeks reimbursement from the federal government at the appropriate FFP rate. Other states employ a managed care model in which the state Medicaid program contracts with one or more managed care organizations to administer the program and pays a monthly premium for each enrollee's coverage, which includes preventive, primary, specialty, and other health services.

[11] Unlike Medicaid, CHIP has an annual allotment cap. However, the same basic rules for participation apply; if a state administers its CHIP program consistent with federal statutory and regulatory requirements, it is eligible to receive the full amount of CHIP funding available within the annual allotment. *See* Medicaid.gov, CHIP Financing (accessed Aug. 25, 2026), https://web.archive.org/web/20260706221037/https://www.medicaid.gov/chip/financing.

57. By way of example, Connecticut is one of several states that employ a fee-for-service model. With this model, the state itself pays providers directly for their services to Medicaid beneficiaries rather than utilizing managed care organizations.

58. By contrast, Maryland operates under a hybrid model. Under this model, most participants receive their Medicaid coverage through a managed care model, known as "HealthChoice," and the state also manages a fee-for-service model for specific populations or services and for individuals who are not in HealthChoice.

**i. States Retain Broad Discretion to Develop Their State Plans.**

59. States exercise their broad discretion to administer their Medicaid programs through the creation of State Plans, which, among other things, identify which groups, services, and programs the state has chosen to cover or implement as part of its Medicaid program. 42 U.S.C. §§ 1396a(a), 1396a(a)(10)(A). The State Plan describes the state-specific standards to determine eligibility, *see, e.g.*, §§ 1396a(a)(10)(A) and (C)(17), (19), (52), (84), (89), and (90); reimbursement methodologies, *see, e.g.*, §§ 1396a(a)(2), (13), (15), (30), (37), and (81); and processes to administer the Medicaid program, *see, e.g.*, §§ 1396a(a)(3), (4), (5), (7), (22), (27), (59), and (83).

60. States similarly shape their CHIP programs, which can be designed to provide coverage through Medicaid State Plans, a separate CHIP program, or a combined CHIP and Medicaid program. Indeed, most states lay out their CHIP benefits in their Medicaid State Plans, rather than as separate CHIP programs. Like Medicaid, CHIP benefits also differ in every state, but each State Plan must cover all care in defined broad categories. States have broad discretion to include healthcare services in CHIP programs that are recognized by state law. 42 U.S.C. § 1397jj(a)(24).

61. CMS's authority to reject a State Plan is circumscribed by the text of the statute. Specifically, the SSA provides that CMS "shall approve" any State Plan that complies with 42 U.S.C. § 1396a(a) and provides specific circumstances under which a State Plan may be rejected.[12] In order to change an existing State Plan, a state must seek a State Plan Amendment ("SPA") from CMS.[13]

62. Once a State Plan is approved by CMS, the State Plan is subject to periodic renewal or automatic periodic review by CMS, and CMS does not have authority to unilaterally change, alter, or revoke approval.[14] States rely upon CMS's approval of State Plans and administer those plans after approval. CMS has approved each Plaintiffs' State Plan through the procedure set out in Medicaid regulations.[15] To initiate a change to a state's coverage, delivery system, or financing, states send SPAs to CMS for review and approval. States may also submit SPAs to request permissible program changes, make corrections, or update their State Plan with new information.

63. Other federal statutes further limit CMS's authority to regulate the states' administration of their State Plans. For example, the Non-Interference Mandate of Section 1554 of the ACA prohibits the Secretary of HHS from promulgating "any" regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;" "impedes timely access to health care services;" or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114.

---

[12] 42 U.S.C. § 1396a(b); *see also Alexander*, 469 U.S. at 303 (states are afforded "substantial discretion" to determine what is covered under their State Plans).
[13] 42 C.F.R. § 430.12(c).
[14] *See* 42 C.F.R. §§ 430.10, et seq. (describing procedure for Plan and SPA approval); 42 C.F.R. § 430.32 (describing program reviews). CMS may withhold payment to a state if, after providing notice and opportunity for a hearing (which includes an opportunity for judicial review), it determines that the State Plan no longer complies with Section 1902 of the SSA. 42 C.F.R. § 430.35(a)(1).
[15] 42 C.F.R. §§ 430.10 et. seq. (describing State Plan submission and approval procedure).

**ii. States Operate Their Medicaid and CHIP Programs Consistent with Other Federal Requirements.**

64. For Medicaid beneficiaries under 21, Congress requires states to include coverage for all services deemed medically necessary under the requirements of the Early and Periodic Screening, Diagnostic, and Treatment Services ("EPSDT") program. 42 U.S.C. §§ 1396d(a)(4), (a)(16) and (r). States must provide beneficiaries under 21 all necessary healthcare, diagnostic services, treatment, and other measures to correct or ameliorate defects and physical and mental illnesses and conditions discovered by screening services, regardless of whether the state has elected to provide those services generally under its State Plan. 42 U.S.C. § 1396d(r)(5). If a service could be available for adults under a State Plan, EPSDT requires that service must be available to those under 21 when medically necessary. EPSDT thus sets a higher floor for covering medically necessary care for beneficiaries under 21 than for Medicaid beneficiaries age 21 and older. Consistent with CMS's longstanding interpretation of states' authority under the Medicaid Act,[16] it is the states that define medical necessity by their own (not the Defendants') standards.[17] Further, under EPSDT, "[t]he determination of whether a service is medically necessary for an individual child must be made on a case-by-case basis, taking into account the particular needs of the child."[18]

65. Additionally, the Medicaid Act requires that the medical assistance made available to a "categorically needy beneficiary," 42 C.F.R. § 440.240, "shall not be less in amount, duration,

---

[16] Ctrs. for Medicare & Medicaid Servs., *State Medicaid Manual*, § 5122, available at https://web.archive.org/web/20260901173752/https://www.cms.gov/regulations-and-guidance/guidance/manuals/paper-based-manuals-items/cms021927.

[17] *See, e.g.*, Cal. Welf. & Inst. Code §§ 14059.5 (defining medically necessary), 14132.025 (requiring Medi-Cal to cover care necessary for the treatment of an emergency medical condition as defined by Section 1317.1 of the California Health and Safety Code); Code of Colo. Reg. 2505-10-8.076.1.8 (defining medically necessary); Conn. Gen. Stat. § 17b-259b (same); 215 Ill. Comp. Stat. 200/15, 134/10 (same); Md. Code Regs. 10.67.01.01(112) (same). *See also* Nat'l Academy for State Health Policy, *State Definitions of Medical Necessity under the Medicaid EPSDT Benefit*, (Apr. 23, 2021), https://perma.cc/PV7M-XT2Q.

[18] Ctrs. for Medicare & Medicaid Servs., EPSDT—A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents 23 (June 2014), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/CMS/epsdt-coverage-guide.pdf.

or scope than the medical assistance made available to any other such individual" (also known as "comparability"). 42 U.S.C. § 1396a(a)(10)(B). CMS's own implementing regulations provide that a state "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). States are thus prohibited from arbitrarily denying or reducing access to medically necessary care solely because of an individual's diagnosis.

66. Finally, any state that participates in the Medicaid pharmacy benefit (which all states do) must also offer "covered outpatient drugs" as part of the Medicaid Drug Rebate Program ("MDRP") as a condition of drawing down FFP, subject only to the categorical, state-optional exclusions Congress enumerated at 42 U.S.C. § 1396r-8(d)(2), none of which applies to transgender healthcare for adolescents. Indeed, in covering this set of statutorily defined medications, states must cover each drug when prescribed for a "medically accepted indication." 42 U.S.C. §§ 1396a(a)(54), 1396r-8(d)(1)(B)(i), 1396r-8(k)(6). A "medically accepted indication" is defined by statute as either the medical use listed on the FDA-approved label or a use listed in one of three pharmaceutical compendia. *Id.* § 1396r-8(k)(6); *see id.* § 1396r-8(g)(1)(B)(i) (listing the three compendia). Even where a drug or medical use falls within one of the (d)(2) optional exclusion categories, § 1396r-8(d)(1)(B) leaves it to each state to decide whether to exclude it. Nothing in the statute authorizes CMS to adopt a mandatory, nationwide exclusion.

67. Puberty suppressing medications (also referred to as "puberty blockers") and hormone therapies, which are prescription medications used in the treatment of gender dysphoria among adolescents, are included in the pharmaceutical compendia as medically accepted

indications and as such qualify as "covered outpatient drugs" within the meaning of the MDRP. *Id.* § 1396r-8(k)(2)(A)).[19]

**C. Many Plaintiff States Cover Transgender Healthcare for Adolescents Under the Above-Described Medicaid and SSA Structure.**

68. Many Plaintiff States are required by law to cover transgender healthcare for adolescents, which may include—based on the individual patient's needs, as determined by their treating, licensed healthcare professionals—counseling, puberty-suppressing medications, hormone therapy, and a broad range of other social and medical interventions. Specifically, many states prohibit discrimination on the basis of gender identity and expression in public accommodations and the provision of medical care,[20] and many state laws explicitly protect access to transgender healthcare for adolescents.[21] Even when such care is not explicitly mentioned in a Plaintiff's State Plan, all Plaintiffs' Medicaid and CHIP programs cover transgender healthcare for adolescents, and all Plaintiffs have received federal reimbursement for this care for years.

69. In determining to cover several types of transgender healthcare interventions for adolescents in their Medicaid and CHIP programs, Plaintiffs that cover the care have thoroughly considered the overwhelming medical consensus that each of these interventions is, when so

---

[19] *See* National Health Law Program, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-9675, https://www.regulations.gov/comment/CMS-2025-1823-9675 (hereinafter "NHeLP Comment"). *See* NHeLP Comment, Attachment 1. ("GnRH agonists such as leuprolide also have been used for pubertal hormone suppression in transgender persons undergoing gender-affirming hormone therapy.").

[20] *See, e.g.,* Cal. Civ. Code § 51; Cal. Health & Safety Code § 1365.5; Colo. Rev. Stat. § 24-34-601; Code of Colo. Reg 702-4-2-62; Conn. Gen. Stat. § 46a-64; Conn. Insurance Dept. Bulletin IC-34; 775 Ill. Comp. Stat. 5/1-102(A), 5/5-102(A), 5/1-103(Q), 5/5-101(A)(6); Md. Code, Health-Gen. §§ 15-103(a)(2)(xxii), 15-151(a)-(c) Mass. Gen. Laws ch 272 §§ 92A, 98; Mass. Code Regs. § 450.202(B); Mass. Div. of Ins. Bulls. 2021-11, accessed at https://archives.lib.state.ma.us/server/api/core/bitstreams/00d2d3c8-5ff5-4c00-8a15-58db92827588/content, 2014-03, accessed at https://archives.lib.state.ma.us/server/api/core/bitstreams/a9f96acb-a79e-4dcc-9e78-6e5cb5b1292c/content; N.J. Stat. Ann. §§ 10:5-5(l), (rr), 10:5-12(f); N.J. Admin. Code §§ 13:45C-4.1 to 4.3; N.Y. Const. art. I, § 11(a); N.Y. Exec. Law §§ 291(2), 296 *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 10, §§ 405.7(b)(2), (c)(2); *id.* tit. 9, § 466.13; N.Y. Pub. Health Law §§ 2803(1)(g), 2803-C-2 Va. Code. § 2.2-3904; Vt. Stat. Ann. tit. 9, § 4502(a).

[21] *See supra* n. 9.

determined by a treating, licensed healthcare professional, medically appropriate, necessary healthcare and meets the states' own rigorous standards for high-quality, effective healthcare.

70. Whether a state explicitly includes transgender healthcare services for adolescents in its State Plan or obtains federal reimbursement for the targeted healthcare as approved medical services through the State Plan, consistent with how all other necessary, approved care is reimbursed with federal funding, the Rule will require each state to submit a SPA to CMS acknowledging the prohibition on federal reimbursement for the targeted healthcare. 91 Fed. Reg. 52463.

**D. The Rule Is Yet Another Step in the Administration's Coordinated Campaign Against Transgender Healthcare for Adolescents.**

71. The Administration has made clear its intention to eliminate all access to the most effective forms of medically necessary transgender healthcare for adolescents.

72. President Trump's attacks on transgender people, including adolescents, began during the first days of his second term in office when the President issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025), which declares it "the policy of the United States to recognize two sexes, male and female[, which] are not changeable and are grounded in fundamental and incontrovertible reality." The attacks continued on January 28, 2025, when President Trump issued Executive Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025), which purported to announce a nationwide ban on transgender healthcare for adolescents, called for the exclusion of such care from federal programs, and threatened civil and criminal prosecution of the providers and entities that provide science-based healthcare to transgender adolescents. In Executive Order 14187, President Trump also

called on HHS to produce a report to establish the "blatant harm done to children by chemical and surgical mutilation." 90 Fed. Reg. 8771.

73. Since those Executive Orders, Defendants and other agencies have engaged in a systematic campaign intended to gut transgender healthcare for adolescents, including by targeting medical providers and hospitals that provide this care. The Administration has been clear about its goals and has boasted when its intimidation campaign resulted in institutions stopping or suspending care.[22]

74. Following Executive Order 14187, on April 11, 2025, CMS issued an open letter to State Medicaid Directors asserting that treatment for gender dysphoria has "proliferated," rests on "an underdeveloped body of evidence," and is now restricted in some countries. CMS "remind[ed]" states of their "responsibility to ensure that payments" are consistent with both "quality of care" and "the best interests of recipients," as set forth in Sections 1902(a)(30)(A) and (19) of the SSA.[23] Thereafter, HHS published the HHS Report[24] in May 2025, pursuant to Executive Order 14187,[25] which it subsequently revised in November 2025. The HHS Report

---

[22] *See* President Donald J. Trump, Truth Social (Aug. 11, 2026), https://web.archive.org/web/20260811213244/https://truthsocial.com/@realDonaldTrump/posts/117078967972327386; *see also* Press Release, The White House, *President Trump Ended Democrats' 'Transgender for Everybody' Insanity*, (Mar. 31, 2026), https://web.archive.org/web/20260331220600/https://www.whitehouse.gov/releases/2026/03/president-trump-ended-democrats-transgender-for-everybody-insanity/ ("As a result, more than three dozen health systems across the country . . . announced they are stopping or suspending child mutilation programs."); *see also* Press Release, The White House, *President Trump Marks Six Months in Office with Historic Successes* (July 20, 2025), https://web.archive.org/web/20250720182103/https://www.whitehouse.gov/articles/2025/07/president-trump-marks-six-months-in-office-with-historic-successes/ ("Hospitals and hospital systems across the country have halted so-called 'gender-affirming care' for minors following President Trump's executive order 'protecting children from chemical and surgical mutilation.'").

[23] CMS, Letter to State Medicaid Directors, *Puberty Blockers, cross-sex hormones, and surgery related to gender dysphoria*, (Apr. 11, 2025), https://www.cms.gov/files/document/letter-stm.pdf.

[24] DEP'T OF HEALTH AND HUMAN SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA: REVIEW OF EVIDENCE AND BEST PRACTICES (2025), https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf (hereinafter "HHS Report"). Additional materials, including the Peer Review Supplement, can be found at https://web.archive.org/web/20260901175328/https://opa.hhs.gov/gender-dysphoria-resources.

[25] *Id.* at 10. Section 3(ii) of Executive Order 14187 orders that "within 90 days . . . [HHS] shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion." 90 Fed. Reg. 8771.

ostensibly reviews the benefits and risks of transgender healthcare for adolescents and ultimately condemns the provision of such care.

75. Notwithstanding that the conclusion of the HHS Report was predetermined by President Trump and HHS itself, the HHS Report suffers from serious methodological problems.[26]

76. Relying on the unsupported HHS Report, HHS and CMS announced a flurry of actions on December 18, 2025. CMS proposed three rules directed at eliminating transgender healthcare for adolescents, including a rule that would categorically exclude hospitals and providers from Medicaid and Medicare participation if they offer certain transgender healthcare interventions for adolescents, "CMS Hospital Condition of Participation to Prohibit Provision of Certain Gender Affirming Care Services for Young People" ("the CoP Rule"). That same day Secretary Kennedy also issued an unprecedented declaration announcing that evidence-based healthcare for transgender adolescents fails to meet professionally recognized standards of healthcare.[27]

77. And as relevant here, Defendants have taken their campaign one step further by unilaterally banning federal reimbursement for many forms of transgender healthcare for adolescents. Their strategy threatens the foundation of the Medicaid system and grossly oversteps the statutory authority provided by Congress.

---

[26] *See generally* Meredithe McNamara et al., Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-9451 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-9451; Movement Advancement Project, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-10275 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-10275; Council for Global Equality Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-9397 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-9397.

[27] After determining that defendants lack authority to establish superseding standards of care to exclude providers from federal healthcare programs, a court has already declared the Kennedy Declaration unlawful, enjoining its implementation and the implementation of any materially similar policy. *Oregon v. Kennedy*, 831 F.Supp.3d 1048, 1054 (D. Or. 2026).

78. Specifically, on December 19, 2025, HHS and CMS published a notice of proposed rulemaking, "Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children." CMS received more than 30,000 comments, and subsequently posted 11,005 of these comments online, including comment letters that Plaintiffs and other stakeholders and interested individuals and groups submitted opposing the proposed rule. "[M]ore than 90 percent" of the comments received by Defendants were filed "in opposition" to the proposed rule. 91 Fed. Reg. 52421.

79. Plaintiff States' comment letter detailed the proposed rule's many legal deficiencies, including that it exceeds Defendants' statutory authority, is contrary to law, is arbitrary and capricious, impermissibly regulates healthcare, and violates the Spending Clause.[28] Numerous professional healthcare organizations, including the American Academy of Family Physicians, American Academy of Pediatrics, American Medical Association, American Psychiatric Association, American Academy of Child and Adolescent Psychiatry, Children's Hospital Association, Endocrine Society, World Health Organization, and many more, also submitted comment letters opposing the proposed rule.

**E. The Rule Unlawfully Prohibits Federal Reimbursement for Certain Healthcare Services for Transgender Adolescents.**

80. On August 13, 2026, HHS and CMS published the Final Rule.

81. The Rule, which prohibits state Medicaid and CHIP programs from using federal dollars to fund broad categories of transgender healthcare for adolescents, is a central component of the Administration's attack on transgender healthcare for adolescents and states' authority.

82. Indeed, on August 11, 2026, the day the Rule was filed for public inspection, President Trump posted on Truth Social that, "[t]oday, at [his] direction, Dr. Mehmet Oz

[28] The Plaintiff States' letter is attached to this Complaint and incorporated herein as Exhibit A.

announced that Medicaid will NO LONGER fund gender transition surgeries and hormones for minors." President Trump further stated that, "[t]hanks to our strong position and pressure on this issue over the past year and a half, dozens of U.S. hospitals have already ended this so-called 'gender-affirming care,' and we expect many more to follow . . . Please remember this when you are casting your vote in the Midterm Elections in November."[29]

83. The Rule is largely identical to the proposed rule. One notable change is that the final Rule temporarily allows the continuation of FFP for the provision of certain types of hormone therapy (referred to in the Rule as "cross-sex hormones") for a limited tapering period not to exceed 6 months from the effective date of the Rule. Puberty blockers and other targeted healthcare are excluded from this tapering provision, meaning FFP will no longer be available for these services beginning on October 13, 2026. The Rule also invokes statutory authority the proposed rule did not identify, including Sections 2102(a)(7)(A), 1902(b), 1904, and 2106 of the SSA.

84. In support of the Administration's goal to end transgender healthcare for adolescents, the Rule adopts new, inflammatory terminology that has no basis in medicine and is not used by the medical community (i.e., "sex-rejecting procedures"[30]) and offers a definition of this terminology that is misaligned with the traditional infrastructure CMS employs and states rely on to administer federal healthcare programs, such as Medicaid. Without statutory authority, the Rule then announces that so-called "sex-rejecting procedures" "may pose a risk of harm to children" and will therefore no longer be covered by Medicaid for individuals under age 18, or by a separate CHIP for those under age 19. 91 Fed. Reg. 52419.

---

[29] President Donald J. Trump, Truth Social (Aug. 11, 2026), https://web.archive.org/web/20260811213244/https://truthsocial.com/@realDonaldTrump/posts/117078967972327386.

[30] The Rule defines sex-rejecting procedures as including "any pharmaceutical or surgical intervention that attempts to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex." 91 Fed. Reg. 52474 (codified at 42 C.F.R. § 441.801).

85. The term "sex-rejecting procedures" does not appear in medical literature or in clinical practice guidelines or diagnostic manuals, as CMS acknowledges, 91 Fed. Reg. 52460, and it is not a billing code or recognized procedure category that could be used by state Medicaid administrators in claims administration without requiring additional interpretation and significant changes to claims processing platforms.[31] The Rule's sweeping definition unworkably groups distinct medical interventions within the single category of "sex-rejecting procedures."

86. Practically speaking, the ban on "sex-rejecting procedures" will require states to exclude from federal reimbursement many forms of transgender healthcare for beneficiaries under the age of 18 in their Medicaid and CHIP programs or under the age of 19 in separate CHIP programs.

**i. The Rule Is Untethered from the SSA, Which Sets Out the Scope of CMS's Delegated Authority.**

87. The Rule does not identify any statute authorizing CMS's exclusion of various forms of healthcare, nor could it. The two primary statutes Defendants rely on as authority for the Rule, Sections 1902(a)(19) and 1902(a)(30)(A) of the SSA—referred to as the "best interests" and "quality of care" provisions, respectively—impose obligations on *the states* and require *them* to develop procedural safeguards for their programs. Historically, CMS and the courts have applied these provisions in connection with administrative, operational, and fiscal mechanics, such as state rate-setting methodologies and eligibility and enrollment procedures.

88. As Defendants concede, CMS has "not previously relied on these provisions to establish a purpose-based restriction on FFP for a specific category of services in this manner." 91 Fed. Reg. 52444. Defendants' attempt now to rely on these statutes to restrict the scope of services

[31] *See* American Academy of Pediatrics, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-10871 (Feb. 19, 2026), https://www.regulations.gov/comment/CMS-2025-1823-10871.

that states may cover, based on Defendants' assessment of the medical necessity of a particular service, is both unprecedented and unfounded.

89. Specifically, the "best interests" provision sets out that the state must provide such "safeguards" to ensure that care and services will be "provided, in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). The provision addresses the methods a state uses to administer its plan so that, overall, the Medicaid agency's coverage decisions and administration of the program are undertaken in the best interests of enrollees. However, this procedural provision does not relate to the scope of Medicaid coverage of specific care itself.

90. The same is true for the "quality of care" provision, which provides that states must implement "such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). Again, the provision does not relate to the scope of Medicaid coverage but instead to the methods by which the states determine the payments for this care are sufficient to ensure certain quality standards.

91. Neither provision limits the type of care states can cover or authorizes Defendants to unilaterally regulate state Medicaid programs by prohibiting the use of federal funds for certain healthcare based on treatment purpose. Nor, as CMS concedes, has the agency ever relied on these provisions to regulate State Plans in a way that categorically prohibits the use of federal funds for certain medical procedures for specific diagnoses that the state has determined to be medically necessary, without Congressional authorization.

92. Defendants also rely on Sections 2101(a), 2102(a), and 2103(c) of the SSA, which they claim authorize CMS to prohibit the use of federal CHIP dollars for the targeted healthcare. *See* 91 Fed. Reg. 52420. However, these sections set out the Congressional purpose in establishing CHIP and the categories of basic services covered by CHIP. Indeed, there is little to support the

idea that 2101(a) sets out a "standard" that CMS may utilize to judge services for reimbursement; rather, the section illustrates the purpose of the title, which is to "provide funds to States to enable them to initiate and expand" the CHIP program in an "effective and efficient manner." Similarly, 2102(a)(7)(A) is a broad statement of the "general contents" of a state's child health program; the "quality and assurance" provision accordingly requires State Plans "to include a description [] of methods (including monitoring) used to assure the quality and appropriateness of care." Not only do these sections not afford CMS the authority to exclude from CHIP federal reimbursement for certain services, they cannot be read to permit CMS to override specific statutory authority elsewhere in Title XXI of the SSA—including Section 2110(a)(24) of the SSA. Section 2110(a)(24) authorizes states to include in their CHIP programs any service that is "recognized by state law," including transgender healthcare for adolescents, as long as the service is provided consistent with state law and provided by or under the supervision of a licensed professional. 42 U.S.C. § 1397jj(a)(24).

93. Finally, Defendants cannot locate the missing authority for this Rule in Section 1102 of the SSA, 42 U.S.C. § 1302, the only rulemaking authority cited in the Rule's regulatory text. 91 Fed. Reg. 52407. Section 1102 authorizes *only* rules "not inconsistent with" the Act as may be necessary to its "efficient administration." This is a general housekeeping provision that cannot supply substantive authority Congress withheld, and certainly not in the case of a Rule that is in fact inconsistent with numerous provisions of the SSA, including Sections 1902(a)(10)(B), 1903(a), 1905(a), 1905(r), 1927, and 2110(a)(24).

94. When Congress intends to exclude a category of medical care from FFP, it does so expressly. Congress enumerated the exclusions from FFP in Section 1903(i) of the SSA, 42 U.S.C. § 1396b(i); placed additional limitations within the statutory definition of "medical assistance," *id.* § 1396d(a); and has imposed other categorical funding restrictions (such as limitations on abortion

funding) through appropriations riders. CMS's own regulations reflect this structure. Existing prohibitions on FFP in 42 C.F.R. part 441 each implement a specific statutory exclusion or condition. *See, e.g.*, 42 C.F.R. § 441.25 (implementing Section 1903(i)(5)); *id.* § 441.13 (implementing the exclusions in Section 1905(a)). In the six decades of the Medicaid program, CMS has never before invoked the SSA's general administrative provisions to categorically exclude from federal reimbursement medically necessary care that states have elected to cover, based on the diagnosis or purpose for which that care is provided.

95. Indeed, Congress recently considered the very exclusion the Rule now imposes, through the identical statutory mechanism, an amendment to Section 1903(i), but chose not to enact it. The House-passed version of the One Big Beautiful Bill Act would have prohibited federal Medicaid and CHIP funding for "specified gender transition procedures." 119th Cong. § 44125 (as passed by House, May 22, 2025). That provision was removed before enactment, and the law Congress passed contains no such exclusion. *See* Pub. L. No. 119-21, 193 Stat. 72 (July 4, 2025). Likewise, the Senate chose not to advance the so-called Health Care Freedom for Patients Act, which similarly would have prohibited the use of federal Medicaid and CHIP funds for "specified gender procedures." S. 3386, 119th Cong. § 302 (Dec. 4, 2025). Defendants cannot accomplish by regulation what Congress has declined to enact by statute.

96. CMS attempts to justify this Rule by pointing to limitations on FFP imposed by Congress, not CMS, noting in the Rule that "Congress has long authorized conditions on the use of Federal program dollars, including conditions that affect which specific services may be paid for." 91 Fed. Reg. 52432. The only limitation on FFP imposed via regulation that CMS cites involved markedly different circumstances and a different authorizing statute, as CMS recognizes. 91 Fed. Reg. 52450–51.

97. CMS also tries to justify the Rule as consistent with recent changes to the Essential Health Benefit ("EHB") framework set out in the ACA and, in particular, the exclusion of the targeted healthcare from EHBs under the 2025 ACA Marketplace Final Rule. 91 Fed. Reg. 52420. However, the EHB provision of the ACA Marketplace Final Rule was vacated on August 14, 2026, and is no longer in effect. *California v. Kennedy*, 26 WL 2364297 at *8 (D. Mass. Aug. 14, 2026) (forthcoming in F.Supp.3d). And even if not vacated, CMS cannot justify a change to Medicaid and CHIP coverage to align with the EHB framework, which is based on comparison to a "typical employer plan" and not Medicaid's own statutory framework. 42 U.S.C. § 18022(b)(2)(A).

**ii. The Rule Is Also Contrary to Numerous Governing Provisions of the SSA and Related Statutes and Regulations.**

98. CMS not only lacks the authority to adopt the Rule, as explained, but also chose to finalize a Rule that directly conflicts with other existing laws and its own regulations.

99. Indeed, compliance with the Rule would force states, as Medicaid administrators, to violate explicit Medicaid requirements established by Congress. Specifically, the Rule would force states to violate the EPSDT requirements because it excludes from federal reimbursement medically necessary services for adolescents under 18 or 19 that are covered for adults. *See* 42 U.S.C. § 1396d(r)(5).

100. Yet CMS explicitly "stand[s] by [its] statement" in the Rule that "this prohibition applies even 'in circumstances in which a provider may determine that a sex-rejecting procedure is medically necessary for a child diagnosed with gender dysphoria.'" 91 Fed. Reg. 52443.

101. This directly conflicts with EPSDT, which requires determinations of medical necessity to be made on a case-by-case basis, as well as CMS's longstanding practice of deferring to the states' definition of medical necessity.[32]

[32] *See supra* nn. 16, 17.

102. Additionally, the Rule would force states to violate the requirements of the MDRP, and CMS's longstanding interpretation of it, by prohibiting states from drawing down federal funds for covered outpatient drugs for patients with gender dysphoria diagnoses only, regardless of whether treatment for gender dysphoria is compendia-included. *See* 42 U.S.C. § 1396r-8(d)(1)(B)(i).

103. The MDRP requires that a state that chooses to cover any covered outpatient drug within its Medicaid program must cover all FDA-approved uses found on the drug's FDA-approved label and medically accepted indications as listed within specified pharmaceutical compendia. 42 U.S.C. § 1396r-8(a)(1). Defendants argue that because "[t]here is no pharmaceutical that is approved" for treatment of gender dysphoria, the Rule does not violate the MDRP. 91 Fed. Reg. 52457; *see also id.* at 52442. This argument misses the point. The statute not only requires states to cover a medication that is FDA-approved for a particular usage but also explicitly requires states to cover any usage that is listed in the specified pharmaceutical compendia under Section 1927(g)(1)(B)(i), 42 U.S.C. § 1396r-8(g)(1)(B)(i). And several medications, including estradiol and triptorelin, are included in the DRUGDEX compendia specifically for the treatment of gender dysphoria.[33] By banning Medicaid coverage of medically accepted indications of these drugs, even if the drugs themselves may still be covered for other purposes, CMS is forcing states to violate the terms of their participation in the MDRP.

104. And the Rule would force states to violate the comparability requirements by providing coverage to one category of patients (e.g., cisgender patients seeking treatment for precocious puberty) but denying the same service to a different category of patients on the basis

[33] *See supra* n. 19, NHeLP Comment. In addition to explaining MDRP requirements and compendia inclusion, the NHeLP Comment also attached the DRUGDEX compendia for CMS's review. *See* NHeLP Comment, Attachment 1.

of medical diagnosis (i.e., patients with a diagnosis of gender dysphoria or gender incongruence). *See* 42 U.S.C. § 1396a(a)(10)(B)(i); 42 C.F.R. § 440.230(c).

105. Defendants concede that the Rule "limits FFP for specific pharmaceutical and surgical interventions for a specific population." 91 Fed. Reg. 52417. The population prohibited from obtaining FFP for treatment that remains reimbursable to others is identified *solely* by beneficiary diagnosis.

106. Specifically, Defendants concede that "[w]hen provided for any other purpose, including treatment of precocious puberty, cancer, endometriosis, hypogonadism, and other medically recognized conditions, the same intervention is not a prohibited sex-rejecting procedure and remains eligible for Federal funding when otherwise covered." *Id.* at 52431. And Defendants further concede that the "prohibition applies even when a provider determines that a sex-rejecting procedure is medically necessary for the treatment of gender dysphoria." *Id.* at 52419.

107. The Rule also conflicts with laws and regulations that provide the states with substantial discretion to administer their CHIP programs. States may include in their CHIP programs any service that is "recognized by State law," such as transgender healthcare for adolescents, as long as the service is provided consistent with state law and by or under the supervision of a licensed professional. 42 U.S.C. § 1397jj(a)(24). Plaintiff States have used this discretion to cover the targeted healthcare in their CHIP programs, which has long been reimbursed by the federal government, and which the Rule would now foreclose.

108. And the Rule conflicts with requirements Congress placed on the Secretary of HHS, which prohibit the agency from issuing any rules that create unreasonable barriers to medical care. Treatment for gender dysphoria in adolescents falls squarely within the law's definition of "medical care," and the Rule would prohibit access to this care.

109. Specifically, the Rule violates Section 1554 of the ACA because it prevents low-income transgender adolescents experiencing gender dysphoria who lack the means to obtain other health insurance or privately pay for these services from timely accessing medically necessary, appropriate healthcare until they reach the age of 18 for Medicaid, or 19 for a separate CHIP. And for transgender adolescents who are currently receiving Medicaid or CHIP coverage for such care, the Rule will abruptly halt reimbursement for their care—either in October 2026 or April 2027, depending on the treatment—even though they continue to experience gender dysphoria, unless alternative funding for these income-eligible adolescents can be secured.

110. Defendants contend that the Rule "comports with section 1554" because it "establishes no obstacle to the continued availability of relevant services" and instead only "withdraw[s] Federal funding" for procedures that "patients remain free to replace through [other] means." 91 Fed. Reg. 52418. Defendants cite two cases as support for their assertion that Section 1554 does not "affect funding decisions," *see id.*, but Defendants ignore contrary and better-reasoned case law holding that Section 1554 is implicated by regulations that "affect[] how consumers pay for medical care." *Planned Parenthood of Maryland, Inc. v. Azar*, 2020 WL 3893241 at *9 (D. Md. July 10, 2020); *see also Mayor of Baltimore v. Azar*, 973 F.3d 258, 280 (4th Cir. 2020) (characterizing case law cited by CMS as "[u]npersuasive and [i]napposite."). And even for states able to assume the full costs of the targeted healthcare, the Rule will impose significant operational burdens on state Medicaid programs, managed care entities, and healthcare providers who must develop and adapt to new systems that risk disruption to Medicaid or CHIP coverage and, ultimately, operate as prohibited barriers to patient care.

**iii. HHS's Commissioned Report Violates the Federal Advisory Committee Act (FACA).**

111. FACA governs the establishment and utilization of advisory committees within the Executive Branch, including by providing general procedures for such committees. At its core,

FACA is meant to be a mechanism for transparency in the creation and development of advice to the Executive Branch. *See* Pub. L. 92–463, §2, 86 Stat. 770 (Oct. 6, 1972).

112. Through Executive Order 14187, which had the stated purpose to end federal funding, sponsorship, promotion, assistance, and support of transgender healthcare for adolescents, President Trump ordered HHS to "publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria," within 90 days of the order. 90 Fed. Reg. 8771. In response, HHS issued the preliminary HHS Report in May 2025 and the final version of the Report in November 2025. In a press release discussing the final Report, HHS confirmed that it had "commissioned" a "study" that makes "find[ings]" and "conclusions."[34] The press release boasts that the "report marks a turning point for American medicine."[35]

113. HHS's process of creating a committee to publish a report on gender dysphoria constitutes the establishment of an advisory committee within the meaning of FACA. 5 U.S.C. § 1001(2)(A)(iii). HHS failed to follow the statutory or regulatory requirements under FACA for a committee. *See* 5 U.S.C. § 1001 *et seq*.; 41 C.F.R. § 102-3 *et seq*.

114. The authors of the Report, sometimes also referred to as "contributors," had a singular purpose—to publish a review on "best practices for promoting the health" of youth with gender dysphoria within 90 days as commanded by President Trump's Executive Order.[36] The authors constituted an "advisory committee" under FACA. They were a "group . . . established or utilized to obtain advice or recommendations for . . . [HHS]," the group was "established or utilized

[34] *See HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, U.S. Department of Health and Human Services (Nov. 19, 2025), https://web.archive.org/web/20251119155000/https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html ("HHS Press Release").
[35] *Id.*
[36] *Supra* n. 24, HHS Report at 4.

by [HHS]," and the group was not "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. § 1001(2).

115. HHS did not comply with the requirements of FACA or its regulations in establishing the HHS Report committee, in the composition of the committee, or in the procedures followed by the committee. For example, HHS did not file a charter containing certain required information, and it did not comply with the statutory prohibition that "[a]n advisory committee shall not meet or take any action until an advisory committee charter has been filed," 5 U.S.C. §§ 1008(c)(1)–(2). HHS also did not publish a notice in the Federal Register announcing the author group, or even initially list any authors whatsoever, or "[c]onduct broad outreach," using a variety of means and methods, to interested parties and stakeholder groups likely to possess "the points of view" required for "fairly balanced advisory committee membership." 41 C.F.R. § 102-3.60(b)(2); *see also id*. at § 102-3.65(a).

116. Nor was the HHS Report the product of a committee that was "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2). Initially, HHS released the Report without identifying or crediting any authors.[37] Seven months later, HHS released its final Report, and a press release stating that it commissioned nine authors to perform "the most comprehensive study to date." *See* HHS Press Release. While HHS claimed that the authors of the HHS Report "include medical doctors, medical ethicists, and a methodologist" who "represent a wide range of political viewpoints and were chosen for their commitment to the scientific process,"[38] the nine "contributors" to the HHS Report had each previously published opinions critical of transgender

[37] *See HHS Releases Comprehensive Review of Medical Interventions for Children and Adolescents with Gender Dysphoria*, U.S. Department of Health and Human Services, May 1, 2025 (last visited Aug. 20, 2026), https://web.archive.org/web/20250501124317/https://www.hhs.gov/press-room/gender-dysphoria-report-release.html.

[38] *See, id.*

healthcare, despite their lack of expertise in the diagnosis and treatment of gender dysphoria or research background in the safety and efficacy of transgender healthcare.[39]

117. Although the Rule acknowledged commenters' concerns about the public statements evidencing bias by the HHS Report's contributors (ignoring concerns about their lack of relevant expertise), Defendants' only response to such concerns was that "the validity of a scientific review is assessed by its methodology and the quality of the evidence it synthesizes, not solely by the prior positions of its authors." 91 Fed. Reg. 52453.

118. Nor did HHS comply with FACA's meetings and records requirements, which require notice of meetings in the Federal Register and the ability of the public "to attend, appear before, or file statements" at meetings, and that an agency make available "all materials that were made available to or prepared for or by an advisory committee," including all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the committee. 5 U.S.C. §§ 1009(a)(2)–(3), (b).

119. Further, the HHS Report "is no mere review of the literature." *EDF, Inc. v. Wright*, 800 F.Supp.3d 284, 289 (D. Mass. 2025) (quotation marks omitted). It evaluates the "overall quality of evidence," recommends weighing certain evidence more heavily while cautioning against relying on "sparse" evidence, draws "important insights," advises on "ethical considerations," and engages in a "risk/benefit" analysis, arriving at a recommendation of what "should not be imposed." HHS Report at 13, 14, 15, 227–28.

---

[39] *See* American Civil Liberties Union Foundation and Lambda Legal Defense & Education Fund, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-10286 at 26–27 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-10286 (describing the authors' backgrounds and public opposition to transgender healthcare).

120. Indeed, HHS and the authors of the HHS Report utilize the HHS Report across media platforms as support for their policy positions. One author, Alex Byrne, explained in detail in an op-ed that the HHS Report advocates for President Trump's policy of suppressing transgender healthcare for adolescents. Byrne states that after surveying the evidence the HHS Report "found" the sought-after conclusion.[40] HHS itself stated that the "conclusions" from the HHS Report "confirm President Trump's Make America Healthy Again Commission's findings." *See* HHS Press Release.

121. CMS also relies on and utilizes the HHS Report. In promulgating the Rule, CMS relies on the HHS Report's "critical insights," "findings," and "indicat[ions]" as to what interventions are, or are not, "effective[]," "benefi[cial]," and "[]favorable." 91 Fed. Reg. 52409–10. In fact, CMS credits the HHS Report as "help[ing] inform us of the current state of medicine to assist us in developing standards for our State partners." 91 Fed. Reg. 52408. CMS also utilizes the substance of the HHS Report to respond to a range of comments on the proposed rule, including adverse comments made by medical professional societies. 91 Fed. Reg. 52411–12 (quoting the HHS Report extensively in response to comments from the American Medical Association, the American Academy of Pediatrics, and the American Psychological Association). Indeed, CMS concedes that various aspects of the Rule, including its "policy determination[s]", and the "nationwide prohibition on Federal Medicaid and CHIP payments" for the targeted healthcare itself, are "grounded in", "based upon", and "support[ed by]" the HHS Report. *See, e.g.*, *id.* at 52416, 52473, and 52453.

---

[40] *See* Alex Byrne, *I co-wrote the anonymous HHS report on pediatric gender medicine*, WASH. POST, June 26, 2025, https://web.archive.org/web/20250626173203/https://www.washingtonpost.com/opinions/2025/06/26/hhs-review-anonymous-author/.

**iv. The Rule Is Textbook Unreasoned Decision-Making.**

122. The Rule is arbitrary and capricious many times over, including because CMS failed to provide reasoned justification for its change in position, offered shifting, pretextual justifications while dismissing significant comments that undermined the rationale for the Rule, and discounted significant reliance interests and harms.

123. *First*, CMS failed to provide adequate justification to prohibit federal reimbursement for the previously covered targeted healthcare. By primarily relying on the HHS Report—a scientifically discredited, methodologically flawed, and unlawful study—CMS subjected much of the contrary medical and scientific evidence before it to a markedly more demanding standard than it applied to the evidence on which it relied. In doing so, CMS failed to adequately address evidence that contradicts its position.

124. Several commenters warned that the HHS Report suffers serious methodological flaws and called into question the HHS Report's validity.[41] Defendants therefore had before them ample evidence that the HHS Report is without scientific merit and has been widely rejected by medical experts in fields including pediatric and family medicine, psychology, obstetrics and gynecology, and endocrinology.[42] Instead of providing a reasoned response explaining why these concerns don't impugn the HHS Report's reliability, the Rule doubles down on the HHS Report and discounts these concerns as Defendants chose to rely on their own Report over independent sources that contradict its findings, including from major medical organizations.

---

[41] *See, e.g., supra* n. 26, McNamara; *see also supra* n. 31, American Academy of Pediatrics; *supra* n. 26, The Council for Global Equality ("[T]he HHS Report's international analysis relies on selective citation, inappropriate conflation of guidance with law, misinterpretation of public health system structures."); American Public Health Association and Public Health Deans and Scholars' Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID 2025-1823-10963 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-10963; *supra* n. 26, Movement Advancement Project Comment Letter.

[42] *Id*.

125. CMS does acknowledge that the HHS Report and Rule "reach[] a different conclusion from certain professional organization guidelines [and that the Rule] is pursuing different actions from other countries." 91 Fed. Reg. at 52427. CMS further concedes that at the very least there is "scientific disagreement" and "clinical disagreement" regarding the safety and efficacy of the targeted healthcare. *Id.* at 52432, 52437.

126. However, even taking CMS at its word that there is clinical and scientific disagreement regarding the safety and efficacy of certain healthcare, which is belied by the facts, the Supreme Court has made clear that the authority to regulate in such areas is left to the States. *United States v. Skrmetti*, 605 U.S. 495, 524 (2025) ("We afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'") (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). Therefore, any uncertainty in the safety and efficacy of the targeted healthcare means the states, not CMS, have the authority to make the requisite medical necessity and coverage determinations for the care.

127. *Second*, CMS relied on pretextual justifications to conceal its animus towards transgender adolescents. *See*, *e.g.*, *In re Administrative Subpoena No. 25-1431-019*, 800 F.Supp.3d 229, 232 (D. Mass. 2025) ("The Administration has been explicit about its disapproval of the transgender community and its aim to end [the targeted healthcare] . . . It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the [states'] right to protect GAC within [their] borders, to harass and intimidate [hospitals] to stop providing such care, and to dissuade patients from seeking such care."). The decision to prohibit federal reimbursement for the targeted healthcare was foreordained by Executive Orders signed nearly a year before the proposed rule was issued. This is reinforced by the actions and statements of senior administration officials that show an entrenched hostility toward the continuation of transgender healthcare for

adolescents.[43] And even after commenters submitted substantial evidence that the targeted healthcare is safe, effective, and medically necessary, CMS disregarded such evidence and relied on the unlawful HHS Report to conclude there are "significant child safety concerns when sex-rejecting procedures are used . . . to align a child's physical appearance or body with an asserted identity that differs from the child's sex." 91 Fed. Reg. 52414. CMS's failure to engage in any meaningful consideration of studies, research, and accounts that conflict with and undermine its justification for this regulatory action demonstrates that CMS had already made up its mind to ban federal reimbursement for the targeted healthcare and failed to engage in reasoned decision-making when crafting this Rule.

128. *Third*, CMS dismissed Plaintiff States' and other stakeholders' reliance interests and the immense harms and costs the Rule will impose. The Plaintiff States have long received FFP for claims related to the treatment of gender dysphoria, and CMS has never rejected or disapproved an undersigned State's Plan based on the inclusion of transgender healthcare. This longstanding structure reflects states' interests in making medical necessity and coverage determinations. CMS cannot disturb these state interests absent Congressional authority, which it lacks. CMS further undercuts states' reliance interests by creating the entirely new definition of "sex-rejecting procedures," which has no basis in medicine, is not used by the medical community, and is inconsistent with the traditional infrastructure CMS employs and states rely on to administer Medicaid.

129. CMS also declined to weigh evidence commenters submitted on the negative consequences, impacts, and costs of the Rule, including greater future healthcare costs for the states as the result of delayed treatment for gender dysphoria, and greater risk of harm for low-

[43] *See supra* n. 22.

income young people who depend on these programs for the transgender healthcare they need.[44] Congress mandated that Medicaid and CHIP enable states to provide medical assistance to families and individuals with low incomes and whose assets are insufficient to cover necessary medical care. CMS waves off these harms, claiming impacted youth and their families can seek coverage for this care elsewhere, including through "private insurance[] or out-of-pocket payment." 91 Fed. Reg. 52433. But low-income Medicaid beneficiaries cannot afford care from a different source. This concern is exacerbated by the fact that the Rule does not allow continued FFP even for those beneficiaries receiving ongoing care. The Rule only provides a limited continuation of FFP for Medicaid and CHIP beneficiaries who are receiving certain types of hormone therapy as of the effective date of this Rule, explicitly excluding those beneficiaries who are receiving puberty suppressing medication, all surgical procedures, and every beneficiary who initiates covered hormone therapy after the effective date, including beneficiaries then mid-course in a protocol their treating physicians have determined to be medically indicated.

130. CMS blames commenters for its failure to revise the Rule's Regulatory Impact Analysis ("RIA") to account for these costs, claiming "the comments generally did not provide data, studies, or analyses sufficient to enable CMS to quantify those impacts." 91 Fed. Reg. 52429. However, CMS is required to consider possible cost increases from its Rule, regardless of the evidence submitted in the comments. And CMS concedes that it did "not estimate[] if there will be any other impacts on Federal expenditures (for example, increases in other healthcare services

[44] *See, e.g.*, Center for Reproductive Rights, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-8519 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-8519; *supra* n. 31, American Academy of Pediatrics; American Foundation for Suicide Prevention, Comment Letter on Proposed Medicaid Reimbursement Rule, Centers for Medicare & Medicaid Services, Comment ID CMS-2025-1823-10127 (Feb. 17, 2026), https://www.regulations.gov/comment/CMS-2025-1823-10127.

related to gender dysphoria)." 91 Fed. Reg. 52466. What's more, several comments did in fact cite studies demonstrating that providing coverage for the targeted healthcare creates cost savings.[45]

131. CMS's Rule is arbitrary and capricious for all the reasons described above and also because of Defendants' failure to grapple with significant comments that undermine the rationale for the Rule or demonstrate its unlawfulness. As noted above, CMS did not adequately address concerns about the harms and costs of the proposed rule. Defendants also offered no response to commenters' warning that the Rule would force states to violate MDRP by requiring them to exclude from coverage medications that are included in the pharmaceutical compendia.

132. Additionally, commenters warned Defendants that the HHS Report was the product of an advisory committee that failed to comply with basic requirements of FACA, including the obligation to publish a notice in the Federal Register announcing the author group and the requirement to maintain a "fair balance" of viewpoints on an advisory committee.[46] Defendants acknowledge such comments, 91 Fed. Reg. 52453, but do not explain how the HHS Report complies with FACA—because it does not.

**v. CMS's Effort to Exclude the Targeted Care Without Congressional Authorization Runs Afoul of the Spending Clause.**

133. The Rule violates the Spending Clause because it imposes new conditions on the states as Medicaid administrators that are contrary to the long-established premise under which states chose to participate in Medicaid and CHIP: that Congress, while mandating coverage of certain services, otherwise permits states to determine which additional services would be covered under their Medicaid and CHIP programs. *See* 42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 431.10; 42 U.S.C. § 1397jj(a)(24). Further, Congress vested the states with the responsibility to establish

---

[45] *See, e.g.*, Exhibit A (citing Am. Med. Ass'n, Health Insurance Coverage for Gender-Affirming Care of Transgender Patients (2025), https://perma.cc/SH6C-MYRT; William Padula, et al., Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis, 31 J. Gen. Internal Med. 4, 394–401 (Apr. 2016)).

[46] *See supra* n. 39.

standards for determining whether services are medically necessary for their Medicaid and CHIP members. 42 U.S.C. § 1396a(a)(17). By unilaterally excluding previously covered drugs and services from federal reimbursement based on Defendants' own determination of medical necessity, the Rule usurps the well-established, Congressionally recognized state authority in this area and alters the Medicaid and CHIP conditions so significantly as to accomplish a shift in kind, not merely degree. *New York*, 414 F. Supp. 3d at 567. Plaintiff States "had no way to know at the time [they] accepted such funds that [CMS] would later claim the right to [determine medical necessity]." *Id.* at 568. For years, Plaintiff States have received millions of dollars in federal reimbursement for the targeted healthcare under multiple administrations consistent with their state laws and policies requiring coverage of such care. Moreover, Defendants acknowledge in the Rule that responsibility for medical necessity decisions has long been lodged with the States. *See, e.g.*, 91 Fed. Reg. 52418. Defendants have no authority to now impose new conditions on Medicaid and CHIP programs by administrative fiat without Congressional authority in an attempt to nullify these valid state laws and policy determinations.

**F. The Rule Immediately and Severely Harms Plaintiffs.**

134. Defendants' actions will injure Plaintiff States as administrators of their Medicaid and CHIP programs. Even if some Plaintiffs can eventually assume the costs of the healthcare that the Rule excludes from Medicaid for transgender adolescents, many may be unable to do so by the Rule's implementation deadline. This may cause some Plaintiffs to accrue a shortfall to pay for the care. And for other Plaintiffs, it may result in low-income transgender adolescent residents losing access to clinically recommended medical care. Young people who are prescribed certain types of hormone therapy will face a similar cliff just six months later.

135. *First,* the Rule directly causes the loss of millions in federal funding for healthcare that many Plaintiffs must still cover under state law, at a time when many states face increases in

healthcare costs and decreases in all available Medicaid funding. *See, e.g.*, One Big Beautiful Bill Act, Pub. L. No. 119-21, §§ 71101–71121, 139 Stat. 72 (2025). As a result, some Plaintiffs will be unable to cover the full costs of the targeted healthcare that had previously been reimbursed by the federal government. And while other Plaintiffs may be able to assume these costs, they may only be able to do so after obtaining legislative approval, which will not occur for many Plaintiffs prior to the implementation deadline.

136. *Second,* if Plaintiffs are unable to assume the full costs of the targeted healthcare by the implementation deadline, then the Rule will impose downstream costs on Plaintiff States by denying Medicaid- and CHIP-eligible transgender adolescent residents access to clinically recommended medical care. Transgender adolescents who lose access to care as a result of exclusion from Medicaid and CHIP reimbursement are likely to require additional and more costly physical and mental healthcare, both immediately and over time as the cumulative effects from the loss of care take a toll on their individual health and well-being.[47] For transgender Medicaid and CHIP beneficiaries who lose access to care as adolescents, the more costly procedures and treatments required as adults will be paid for by Plaintiffs. Even if Plaintiffs did not protect this care for all ages by state law, Plaintiffs would still bear the burden of these more costly procedures for adults, since Plaintiffs cover these services for beneficiaries over the age of 19 and Defendants have not excluded such services from federal reimbursement.

137. *Third,* the Rule discounts Plaintiffs' significant reliance interests in administering their Medicaid and CHIP programs under their existing frameworks and imposes administrative

---

[47] Landon D. Hughes et al., *"These Laws Will Be Devastating": Provider Perspectives on Legislation Banning Gender-Affirming Care for Transgender Adolescents*, 69 J. Adolescent Health 976 (2021) ("[P]roviders described how denial of evidence-based, gender-affirming care for [transgender and gender-diverse adolescents] will necessitate more serious and costly interventions including avoidable surgeries later in life"); *Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors,* 134 Harv. L. Rev. 2163 (2021) (explaining how puberty blockers and hormone replacement therapies allow transgender adolescents to avoid intense psychological distresses, including anxiety, depression, and suicidal behavior).

and operational burdens on Plaintiffs. For example, state Medicaid agencies will likely have to issue guidance, notify impacted beneficiaries of changes to coverage, work with providers and managed care organizations to communicate changes to services, amend or potentially negotiate new contracts with managed care organizations, and alter billing and coding systems to account for the Rule's changes. States also may not be able to change their medical or pharmacy claims system by the implementation date and will have to implement administratively burdensome workarounds in order to achieve compliance. In addition, to comply with the Rule Plaintiff States would need to adopt, and managed care plans, pharmacies, and prescribing providers would need to adhere to, new prior authorization or other utilization-management requirements for affected medications, creating costly and burdensome processes that will extend far beyond treatment for gender dysphoria and affect patients taking the impacted medications for purposes that are not prohibited. All of this will need to occur while states expend time and resources to implement substantial program changes that will take effect this year.[48] Plaintiffs also will be required to submit SPAs to account for these changes. Similarly, Plaintiffs will incur administrative costs caused by the change in benefits for existing beneficiaries receiving this care. All such beneficiaries must be given notice and may request a hearing upon a change in benefits. Though the states are not always required to hold such hearings, they must process notices and requests for hearings, which will impose an administrative burden.[49] The same is true not only for beneficiaries currently receiving care, but also for any who seek coverage for medically necessary care that is denied in the future.

---

[48] *See* One Big Beautiful Bill Act, Pub. L. No. 119-21, §§ 71101–71121, 139 Stat. 72 (2025). For example, Medicaid agencies will be implementing significant funding cuts, changes to administrative requirements and conditions on eligibility (including work requirements) for beneficiaries seeking to enroll in Medicaid, along with significant changes to Medicaid provider taxes.

[49] 42 C.F.R. § 431.200 *et. seq*.

138. *Fourth*, by excluding federal reimbursement for the targeted healthcare, the Rule hinders Plaintiffs' ability to comply with provisions of the Medicaid Act and SSA, their EPSDT obligations, the MDRP, as well as state laws. The EPSDT and comparability requirements, as well as the MDRP, impose obligations on the states, not the federal government. Excluding certain transgender healthcare services for adolescents from coverage could run afoul of these requirements. The Rule also imposes obligations that are at odds with some state antidiscrimination laws that expressly prohibit discrimination against transgender persons in the provision of healthcare.

139. *Fifth,* the Rule harms Plaintiffs' independent authority and sovereign interests by unilaterally declaring that certain healthcare interventions for adolescents suffering from gender dysphoria are harmful and lack evidence supporting their safety or efficacy and therefore are not entitled to federal reimbursement. The states have longstanding authority to make policy decisions and develop standards to ensure the health, wellbeing, dignity, and autonomy of their residents. Further, to the extent that Plaintiffs with laws requiring their Medicaid and/or CHIP programs to cover the cost of targeted healthcare are unable to retool their systems and secure appropriations of state funding to ensure targeted healthcare can continue uninterrupted, they will suffer a sovereign injury as a result of being prevented from enforcing and effectuating their own laws.

## CAUSES OF ACTION

### COUNT ONE
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)
### *FINAL AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY*

140. Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

141. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right." 5 U.S.C. § 706(2)(C). Because Defendants are "creatures of statutes" and "possess only the authority that Congress has provided," they may exercise only authority granted to them by statute. *See National Fed'n of Indep. Bus v. Department of Labor, Occupational Safety & Health Admin.,* 595 U.S. 109, 117 (2022). The Rule is a final agency action for which there is no other adequate remedy and is "subject to judicial review." 5 U.S.C. § 704.

142. Congress created Medicaid and CHIP, which cover millions of low-income individuals and families, as state-federal partnerships with substantial authority and discretion left to the states. Under the originating statutes, it is the states, and not Defendants, who establish which kinds of "medical assistance" are covered.

143. Defendants have no authority under the Medicaid Act, SSA, or any other statute to make sweeping determinations limiting the kind of "medical assistance" that is federally reimbursable.

144. Defendants rely upon the "best interests," "quality of care," and "efficient and effective" provisions of the SSA to justify the Rule. Yet these provisions vest authority and responsibility in the states, not in Defendants, to enact safeguards in their Medicaid programs to guarantee high-quality care. The provisions offer no statutory authority for Defendants to exclude from federal reimbursement various types of evidence-based healthcare that numerous states affirmatively permit and protect solely based on the health condition the care is treating.

145. The claimed authority also has no limiting principle: the relevant statutory provisions contain no age limitation and no subject-matter limitation. On Defendants' reading, CMS could unilaterally strip federal reimbursement from any treatment, for beneficiaries of any age, that any administration disfavors. However, Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies."

*West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks omitted). This is especially true where an agency's action would alter the balance of power between the federal government and states.

146. The Rule thus violates the Administrative Procedure Act, because Defendants acted in excess of statutory jurisdiction, authority, or limitations.

**COUNT TWO**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)**
***FINAL AGENCY ACTION CONTRARY TO LAW***

147. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

149. The Rule is a final agency action for which there is no other adequate remedy and is "subject to judicial review." 5 U.S.C. § 704.

150. The Rule conflicts with multiple, substantive statutory requirements for Medicaid and CHIP programs, including Medicaid's comparability requirement, EPSDT, MDRP, Section 2110(a)(24) of the SSA, and Section 1554 of the Affordable Care Act.

151. *First,* the Rule's ultimate effect of denying medically necessary services to Medicaid recipients violates Medicaid's comparability requirement by providing coverage to one category of patients but denying the same service to a different category of patients on the basis of medical diagnosis. 42 U.S.C.§ 1396a(a)(10)(B); 42 C.F.R. §§ 440.230(c), 440.240.

152. *Second,* the Rule's ultimate effect of denying medically necessary services to Medicaid enrollees violates the Medicaid Act's EPSDT standards that require medical necessity to be determined on an individual basis and based on the needs of the particular child, and that

services states have determined to be medically necessary be made available to Medicaid enrollees. 42 U.S.C. §§ 1396d(a)(4), (a)(16) and (r). The categorical prohibition of coverage for the targeted healthcare for the treatment of all gender dysphoria for adolescents violates this case-by-case mandate. Indeed, Defendants acknowledge that the "prohibition applies even 'in circumstances in which a provider may determine that a sex-rejecting procedure is medically necessary for a child diagnosed with gender dysphoria.'" 91 Fed. Reg. 52443.

153. *Third,* the Rule is wholly inconsistent with the MDRP's requirement that states cover FDA-approved medications for their medically accepted uses, 42 U.S.C. § 1396r-8(k)(2), given that puberty suppressing medications and hormone therapies are explicitly recognized as medically accepted treatments for gender dysphoria in adolescents.

154. *Fourth,* the Rule conflicts with Section 2110(a)(24) of the SSA, governing CHIP, by excluding from federal reimbursement the targeted healthcare, even though states are allowed to include in their CHIP programs any service that is "recognized by state law," including transgender healthcare for adolescents, as long as the service is provided consistent with state law and provided by or under the supervision of a licensed professional. 42 U.S.C. § 1397jj(a)(24).

155. *Fifth,* the Rule conflicts with Section 1554 of the Affordable Care Act by "creat[ing] . . . unreasonable barriers" and "imped[ing] timely access to" treatment for gender dysphoria for low-income transgender Medicaid and CHIP beneficiaries. 42 U.S.C. §§ 18114(1)–(2). Defendants recognize that the Rule will impose barriers to timely access to care, noting that low-income patients will be forced to abandon ongoing treatment or will never receive it in the first place.

**COUNT THREE**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)**
***ARBITRARY AND CAPRICIOUS FINAL AGENCY ACTION***

156. Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

157. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

158. An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

159. The Rule is a final agency action for which there is no other adequate remedy and is "subject to judicial review." 5 U.S.C. § 704.

160. The Rule is arbitrary and capricious for several reasons, including but not limited to the arguments below.

161. *First*, CMS fails to provide reasoned justification for the Rule's departure from six decades of past practice, medical consensus, and long-established standards of care set by professionals in this field of medicine. The Rule discounts reputable, significant, evidence-based scientific studies and fails to address Plaintiff States' determinations that the targeted healthcare constitutes safe, medically necessary care, including for adolescents. Indeed, Defendants rely heavily on the HHS Report as a basis for excluding the targeted healthcare. Yet the HHS Report fails to meet scientific standards as noted by commenters. In relying on the HHS Report, the Rule

does not address the large body of medical and scientific evidence that Plaintiff States have assessed in determining to cover this care, including evidence critical of the HHS Report's methodology and findings, which numerous commenters brought to CMS's attention in opposing the proposed rule.

162. *Second*, the Rule relies on the HHS Report, which in addition to its methodological and scientific shortcomings, was developed by a committee that violates the requirements of FACA. Specifically, FACA permits federal agencies to establish or utilize advisory committees "to obtain advice or recommendations," 5 U.S.C. § 1001(2)(A), "only when they are determined to be essential," 5 U.S.C. § 1002(b)(2), and subject to transparency and membership requirements. Yet in establishing the committee that published the HHS Report, HHS failed to satisfy the membership requirements of FACA. The authors do not represent "points of view" that are "fairly balanced." 5 U.S.C. § 1004(b)(2). Although the contributor biographies in the HHS Report use neutral language, such as noting that some have published "on topics in pediatric gender medicine,"[50] each of the contributors had previously spoken out against transgender healthcare for adolescents. And none of the contributors are experts in the diagnosis and treatment of gender dysphoria or the safety and efficacy of such care. Further, HHS failed to satisfy the transparency requirements under FACA. HHS never noticed the establishment of a committee nor demonstrated any essential need for the committee. 5 U.S.C. §§ 1002(b)(2), (5). Instead, HHS purported to commission a study by inviting authors from a variety of disciplines.[51] When it did, HHS failed to take the steps that FACA and its implementing regulations require in establishing an advisory committee including, but not limited to, failing to, on information and belief: 1) establish the

[50] *Supra* n. 24, HHS Report at 17.

[51] *See supra* n. 34, HHS Press Release ("HHS commissioned the most comprehensive study to date of the scientific evidence and clinical practices surrounding the treatment of children and adolescents for 'gender dysphoria.' The authors were drawn from [multiple] disciplines.").

committee, 41 C.F.R. § 102-3.60; 2) publish notice, *id.* § 102-3.65; 3) file a charter, or publish information required for a charter, 5 U.S.C. § 1008(c); 41 C.F.R. § 102-3.70; 4) comply with committee meeting requirements, 5 U.S.C. § 1009; 41 C.F.R. §§ 102.3.120, 102-3.140, 102-3.150; 5) make transcripts or minutes available or otherwise document committee meetings, 5 U.S.C. § 1008; 41 C.F.R. §§ 102-3.165, 102-3.170; 6) properly implement the committee, 41 C.F.R. § 102-3.125; 7) keep fiscal records, 5 U.S.C. § 1011; or 8) comply with reporting and recordkeeping requirements, 41 C.F.R. § 102-3.175. Defendants' utilization of the HHS Report produced in violation of FACA to justify the Rule itself is therefore arbitrary and capricious.

163. *Third,* the Rule arbitrarily and unlawfully relies on pretextual justifications to conceal CMS's animus towards transgender adolescents. The Rule rests on the Trump Administration and CMS's preconceived views as documented and directed in the President's Executive Orders and the HHS Report on the safety and efficacy of certain transgender healthcare interventions for adolescents. Especially where CMS has failed to engage with substantial evidence submitted by commenters that conflicts with and undermines its justification for this regulatory action, it is clear CMS had already made up its mind to ban federal reimbursement for the targeted healthcare.

164. *Fourth,* the Rule fails to accommodate or acknowledge important reliance interests such as Plaintiffs' significant reliance interests in administering their Medicaid and CHIP programs under their existing frameworks and previously approved State Plans and long-recognized authority to make medical necessity and coverage determinations. CMS also fails to seriously consider the costs, including greater future healthcare costs for Plaintiff States as the result of delayed treatment for gender dysphoria, greater risk of harm for low-income young people who would lose access to the targeted healthcare, despite commenters who provided data and urged CMS to revise its RIA to account for these costs. Finally, CMS is dismissive of the significant

costs associated with the technical and operational complexity of implementing the Rule, suggesting without basis, evidence, or reasoning that state agencies have the tools and time to comply with the Rule's age and purpose-based restrictions on coverage.

165. *Finally,* Defendants' failure to meaningfully consider significant comments that undermine the rationale for the Rule or demonstrate its unlawfulness is an independent reason the Rule is arbitrary and capricious.

**COUNT FOUR**
***UNITED STATES CONSTITUTION: SPENDING CLAUSE***

166. Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

167. The Spending Clause of the U.S. Constitution grants Congress the power to impose taxes and borrow money to "pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It allows Congress to "attach conditions on the receipt of federal funds." *South Dakota v. Dole, 483* U.S. 203, 206 (1987); *see also NFIB*, 567 U.S. at 537.

168. However, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" the conditions Congress seeks to impose. *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981). "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Any conditions must be imposed "unambiguously" and cannot "surpris[e]" states participating in a state-federal cooperative program "with post acceptance . . . conditions." *NFIB*, 567 U.S. at 583–84, 637 (internal quotations omitted); *see also Pennhurst,* 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

169. The Rule violates the Spending Clause by placing new conditions on an existing program involving federal funds. As when assenting to a contract, funding "[r]ecipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand . . . the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, P.L.L.C.,* 596 U.S. 212, 219 (2022) (internal quotations omitted). The Rule imposes new conditions on Medicaid and CHIP funding that Plaintiffs could not have anticipated at the time they entered into their State Plan with CMS—namely, that the agency could usurp the states' medical necessity determinations and unilaterally exclude from reimbursement previously covered services for a particular class of beneficiaries absent express Congressional authorization. As noted above, CMS admits that this is unprecedented action, based on new interpretations of statutes that are contrary to its historical position. 91 Fed. Reg. 52443–44. Plaintiffs could not have voluntarily agreed to these funding restrictions simply by participating in Medicaid. Indeed, also as noted above, Congress granted states significant discretion in all aspects of administering their Medicaid programs, including the ability to establish standards for determining whether services are medically necessary for their Medicaid beneficiaries—discretion that has been afforded to the states since the Medicaid Act was enacted in 1965.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a. Declare the Rule unlawful because it violates the Administrative Procedure Act;

b. Declare the Rule unlawful because it violates the Spending Clause, U.S. CONST., art. I § 8, cl. 1;

c. Vacate the Rule Pursuant to 5 U.S.C. § 706;

d. Permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rule in any form within the Plaintiff States;

e. Stay the effective date of the Rule pending judicial review pursuant to 5 U.S.C. § 705 within the Plaintiff States;

f. Award Plaintiff States' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

g. Award such additional relief as the interests of justice may require.

Dated: September 2, 2026

Respectfully Submitted,

**KWAME RAOUL**
Attorney General of Illinois

By: *s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELIZABETH B. SCOTT*
Assistant Attorney General
ABIGAIL R. DURKIN*
Assistant Attorney General II
ELENA S. METH*
Assistant Attorney General
KATHARINE P. ROBERTS*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
Tel (773) 914-3046
aleeza.strubel@ilag.gov
elizabeth.scott@ilag.gov
abigail.durkin@ilag.gov
elena.meth@ilag.gov
katharine.roberts@ilag.gov

*Attorneys for Plaintiff State of Illinois*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Alma Rose Nunley*
ALMA ROSE NUNLEY*
Assistant Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Alma.nunley@ct.gov

*Attorney for Plaintiff State of Connecticut*

**ROB BONTA**
Attorney General of California

By: *s/ Shireen Farahani*
SHIREEN FARAHANI*
HILARY BURKE CHAN*
Deputy Attorneys General
NIMROD PITSKER ELIAS*
Supervising Deputy Attorney General
1515 Clay St., Suite 2000
Oakland, CA 94612
hilary.chan@doj.ca.gov
shireen.farahani@doj.ca.gov
nimrod.elias@doj.ca.gov

*Attorneys for Plaintiff State of California*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: *s/ Lauren Gorodetsky*
MICHAEL DREZNER*
Senior Assistant Attorney General
LAUREN GORODETSKY*
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Tel (410) 576-7057
lgorodetsky@oag.maryland.gov
mdrezner@oag.maryland.gov

*Attorneys for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: *s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
Director, Reproductive Justice Unit
ADAM M. CAMBIER (BBO No. 690525)
JAK KUNDL (BBO No. 713951)
MORGAN CARMEN (BBO No. 716769)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
Tel (617) 963-2811
allyson.slater@mass.gov
adam.cambier@mass.gov
jak.kundl@mass.gov
morgan.carmen@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

**PHIL WEISER**
Attorney General of Colorado

By: *s/ Gabe Podesta*
GABE PODESTA*
RYAN LORCH
Senior Assistant Attorneys General
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov
ryan.lorch@coag.gov

*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: *s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Siena Rose Mary Hohne*
SIENA ROSE MARY HOHNE*
Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 705-1289
Siena.Hohne@dc.gov

*Attorney for Plaintiff District of Columbia*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai‘i

By: *s/ Kaliko‘onālani D. Fernandes*
KALIKO‘ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorney for Plaintiff State of Hawai‘i*

**AARON M. FREY**
Maine Attorney General

By: *s/ Kendall R. Schutzer*
KENDALL R. SCHUTZER*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8452
Kendall.Schutzer@Maine.gov

*Attorneys for Plaintiff State of Maine*

**DANA NESSEL**
Attorney General for the State of Michigan

By: *s/ Daniel Ping*
DANIEL J. PING*
Assistant Attorney General
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

By: *s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

**AARON D. FORD**
Attorney General

By: *s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: *s/ Andrea I. Cavazos*
ANDREA I. CAVAZOS*
KEVIN BUI*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
andrea.cavazos@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

**LETITIA JAMES**
Attorney General for the State of New York

By: *s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
LINDA B. EVARTS*
Special Counsel
MOLLY BRACHFELD*
ANDRES IVAN NAVEDO*
Assistant Attorneys General
28 Liberty St.
New York, NY 10005
(212) 416-8333
rabia.muqaddam@ag.ny.gov
linda.evarts@ag.ny.gov
molly.brachfeld@ag.ny.gov
ivan.navedo@ag.ny.gov

*Attorneys for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

By: *s/ Allie M. Boyd*
ALLIE M. BOYD*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 947-4700

*Attorney for Plaintiff State of Oregon*

**JOSH SHAPIRO,**
***in his official capacity as Governor of the Commonwealth of Pennsylvania***

JENNIFER SELBER
General Counsel

By: *s/ Aimee D. Thomson*
AIMEE D. THOMSON*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

*Attorneys for Plaintiff Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: *s/ Lee Staley*
LEE B. STALEY*
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Samuel B. Stratton*
SAMUEL B. STRATTON*
Assistant Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
sam.stratton@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JAY JONES**
Attorney General of Virginia

By: *s/ Megan C. Keenan*
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorney for Plaintiff Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ William McGinty*
WILLIAM MCGINTY*
CRISTINA SEPE*
Deputy Solicitors General
LAURYN K. FRAAS*
NEAL LUNA*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
william.mcginty@atg.wa.gov
cristina.sepe@atg.wa.gov
lauryn.fraas@atg.wa.gov
neal.luna@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin

By: *s/ Jody J. Schmelzer*
JODY J. SCHMELZER*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-3094
jody.schmelzer@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

* pro hac vice forthcoming